IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:05-cr-119-MEF |
| | ) | [WO] |
| RICHARD M. SCRUSHY | ) | |

## MEMORANDUM OPINION AND ORDER

In 2006, Defendant Richard M. Scrushy ("Scrushy") and co-defendant former Alabama Governor Don Siegelman ("Siegelman") were convicted of federal funds bribery, in violation of 18 U.S.C. § 666(a)(1)(B), and five counts of honest services mail fraud and conspiracy, in violation of 18 U.S.C. §§ 1341, 1346, and 371.[1] Siegelman was also convicted of obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3). Now pending before the Court is Scrushy's motion for new trial based on newly discovered evidence. (Doc. # 953.) The motion raises five separate issues of perceived structural and constitutional error in the trial: (1) that Scrushy was selectively prosecuted in violation of his equal protection rights under the Fifth Amendment; (2) that *ex parte* communications between the United States Marshals Service and the undersigned regarding certain e-mails purportedly sent between jurors violated his Sixth Amendment right to counsel and Fifth Amendment right to due process; (3) that then-United States Attorney Leura Canary's ("Canary") alleged failure to abide by her publicly-announced recusal from the case deprived him of his right to a

---

[1] The convictions on two of the honest services mail fraud and conspiracy counts, Counts 8 and 9 of the Second Superseding Indictment, (Doc. # 61), were reversed by the Eleventh Circuit as to both Defendants. *United States v. Siegelman*, 640 F.3d 1159, 1174–77 (11th Cir. 2011).

disinterested prosecutor; (4) that the Government's failure to report contacts with jurors and the U.S. Marshals' involvement in *ex parte* communications deprived him of his Fifth Amendment right to a fair trial and Sixth Amendment right to an impartial jury; and (5) that the Government engaged in prosecutorial misconduct by witness coaching, withholding exculpatory and impeaching evidence and failing to correct false and misleading testimony by Government witness Nick Bailey in violation of his Fifth Amendment rights.[2] His claims fail on their merits, and his motion for a new trial is due to be **DENIED**.

## I. STANDARD OF REVIEW

A motion for a new trial made under Fed. R. Crim. P. 33(b)(1) must be "grounded on newly discovered evidence[.]" *See also United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc). Because maintaining the finality of convictions is "critically important" to our criminal justice system, *Gilbert v. United States*, 640 F.3d 1293, 1309 (11th Cir. 2011) (en banc) (Carnes, J.), "[m]otions for a new trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution." *Campa*, 459 F.3d at 1151. "[T]he defendant bears the burden of justifying a new trial." *Id.*

Newly discovered evidence giving rise to a meritorious Rule 33(b)(1) motion may support a claim of innocence, reveal a *Brady* or *Giglio* violation, or malign the integrity of the jury's verdict. *See Campa*, 459 F.3d at 1151 ("Newly discovered evidence need not relate directly to the issue of guilt or innocence to justify a new trial, 'but may be probative

---

[2] Although Scrushy attempts to differentiate his claims of government misconduct, the Court will consider all of his claims related to Nick Bailey and other witnesses collectively in Section V of this opinion.

of another issue of law.'  For instance, the existence of a *Brady* violation, as well as

questions regarding the fairness or impartiality of a jury, may be grounds for a new trial.")

(quoting *United States v. Beasley*, 582 F.2d 337, 339 (5th Cir. 1978))).  The common thread

that ties together the types of evidence supporting a proper Rule 33(b)(1) motion is that the

newly discovered evidence must, in some non-attenuated and material way, impugn the

reliability of the jury's verdict.

To obtain a new trial on non-*Brady* claims based upon newly discovered evidence, a

defendant must show that:

> (1) the evidence was discovered after trial[;] (2) the failure of the defendant to
> discover the evidence was not due to a lack of due diligence[;] (3) the evidence
> is not merely cumulative or impeaching[;] (4) the evidence is material to issues
> before the court[;] and (5) the evidence is such that a new trial would probably
> produce a different result.

*United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003) (quoting *United States v.

Ramos*, 179 F.3d 1333, 1336 n.1 (11th Cir. 1999)).  "Failure to meet any one of these

elements will defeat" the motion.  *United States v. Starrett*, 55 F.3d 1525, 1554 (11th Cir.

1995).  To obtain a new trial premised on *Brady* claims, the defendant must show that:

> (1) the Government possessed favorable evidence to the defendant; (2) the
> defendant [did] not possess the evidence and could not [have] obtain[ed] the
> evidence with any reasonable diligence; (3) the prosecution suppressed the
> favorable evidence; and (4) had the evidence been disclosed to the defendant,
> there is a reasonable probability that the outcome would have been different.

*United States v. Vallejo*, 297 F.3d 1154, 1163–64 (11th Cir. 2002); *see also United States v.

Elso*, 364 F. App'x 595, 598–99 (11th Cir. 2010).  With respect to *Giglio* challenges, "the

defendant must demonstrate that the prosecutor 'knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material.'" *Vallejo*, 297 F.3d at 1163–64 (quoting *United States v. Dickerson*, 248 F.3d 1036, 1041 (11th Cir. 2001)). With these principles of law in mind, the Court now turns to Scrushy's specific issues.

## II. DISCUSSION

### A. Selective Prosecution

Nearly three years after the jury's verdict, Scrushy maintains for the first time in this Court that he was selectively prosecuted for political purposes in violation of his Fifth Amendment right to equal protection and First Amendment right to contribute to issue-advocacy campaigns. (Doc. # 953 at 40.) Stated briefly, Scrushy argues that the prosecution of this case was initiated to ensure that Siegelman, a Democrat, would be defeated by his Republican opponent, Bob Riley, in the 2006 Alabama gubernatorial race. This claim fails procedurally and on the merits.

#### 1. Waiver and Lack of "Good Cause"

"[S]elective prosecution is a defect in the *institution* of the prosecution that has no bearing on the determination of factual guilt." *United States v. Jones*, 52 F.3d 924, 927 (11th Cir. 1995) (emphasis added) (citing *United States v. Jennings*, 991 F.2d 725, 730 (11th Cir. 1993)). "Federal Rule of Criminal Procedure 12(b) requires that this defense be raised by pretrial motion[.]" *Id.* at 927 n.5 (citing *Jennings*, 991 F.2d at 730). "If the defendant fails to raise a selective prosecution defense prior to trial, the defendant waives the defense[.]"

*Id.* (citing Fed. R. Crim. P. 12(f)). "However, the court may grant relief from [the] waiver if the defendant shows cause for [the] delay in raising the defense." *Id.* (citing *Jennings*, 991 F.2d at 730); Fed. R. Crim. P. 12(e). By raising it for the first time three years post-verdict, Scrushy has waived the defense of selective prosecution. In fact, Scrushy was required to raise his selective prosecution defense not just before the trial commenced, but within the time prescribed by the Court to file pretrial motions. *Jennings*, 991 F.2d at 729–30. The Scheduling Order (Doc. # 103), as amended (Doc. # 120), required that "[a]ll pretrial motions [be] filed on or before February 13, 2006." (Doc. # 103.) Although Scrushy filed a plethora of pretrial motions, not one raised a selective prosecution defense. (*See* Docs. #34, 56, 69, 104, 105, 123, 124, 126, 130, 131, 132, 133, 147, 189, 242, & 266.)

To pursue this claim now, Scrushy must demonstrate "good cause" for the very substantial delay in raising the defense. Fed. R. Crim. P. 12(e). The defendant wholly fails to acknowledge his waiver of a selective prosecution defense and, by consequence, does not even broach the subject of "good cause" for the three year delay. Furthermore, as demonstrated below, no "good cause" exists in this case.

In support of his selective prosecution claim, Scrushy relies heavily on allegations recited by the April 17, 2008 report prepared for John Conyers, Jr., Chairman of the United States House of Representatives Committee on the Judiciary ("the Conyers Report"). In this report, the Committee on the Judiciary investigated allegations that "political considerations may have improperly influenced federal criminal prosecutions in a number of cases around

the country." (Doc. # 953, Ex. I-A, at i.)[3]  The Conyers report depends in large part on allegations by Attorney Dana Jill Simpson ("Simpson") to substantiate the contention that the prosecution of Siegelman was improperly motivated.  (Doc. # 953, Ex. I-A, at 7–19.) Simpson relayed conversations she allegedly had with Rob Riley, the son of Republican Bob Riley, that implicated Karl Rove, the Department of Justice and then-United States Attorney Canary's husband in efforts to prosecute Siegelman.  (Doc. # 953, Ex. I-A, at 9–10.)  The report concludes with the recommendation that "a thorough and fair review by the Executive Branch [of the Department of Justice]" be undertaken.  (*Id*. at 34.)

Although many of the more detailed factual allegations recited by the Conyers Report—and in particular the factual allegations of Simpson—could not have been known to Scrushy prior to trial, the materials provided to the Committee on the Judiciary, which form the basis of the Conyers Report's conclusions, coupled with the evidentiary attachments to Scrushy's motion, show that Scrushy had knowledge of, and co-defendant Siegelman was claiming, a potential selective prosecution claim as early as three years prior to the commencement of trial in this case.[4]

Scrushy previously had been indicted in the Northern District of Alabama on similar charges, which were eventually dismissed for lack of evidence.  Siegelman's attorney at the time, Doug Jones, testified before the House of Representatives Committee regarding the

---

[3]  For ease and consistency, the page numbers cited in the Conyers Report and other exhibits refer to the exhibit's pagination, not the pagination assigned by the Court's electronic docketing system.

[4]  Scrushy also fails to explain why his motion for a new trial was not filed for a full year and two months after the release of the Conyers Report.

Department of Justice's supposed switch in its position on the case that occurred in mid-2004. (Doc. # 953, Ex. I-A, at 7.) Jones testified that the Department of Justice had "written off" any investigation of Siegelman, but then he was informed that "'there had been a meeting in Washington'" that led to a "'review of the case top to bottom.'" (*Id*. at 12 (quoting Jones's testimony).) Jones further testified that what "'[he and counsel for Defendant Siegelman] saw *beginning in early 2005*, was much more than simply a top to bottom review.'" (*Id*. at 13 (quoting Jones's testimony).) Rather, Jones testified that the Government "'[was] fishing around for anything they could find . . . .'" (*Id*.) Scrushy's lawyer, Arthur Leach, "informed the Committee that, in 2004, 'for a variety of reason it was [his] opinion that the matter was close.' In mid-2005, however, 'the case came back to life.'" (*Id*. at 14.) Thus, the Conyers Report reveals that the defendants were on notice prior to trial that there existed the possibility that direction had potentially come from Washington to pursue charges against Scrushy and Siegelman.

Furthermore, Leach submitted a letter to the Committee which stated that he met with then-acting head of the Department of Justice's Public Integrity Section, Andrew Lourie, on April 6, 2006. According to Mr. Leach, he had "worked out an arrangement [for a plea] that was acceptable to the line prosecutors working the case" and that he met with Mr. Lourie to obtain "approval for the deal." (*Id*.) Although Mr. Leach felt that the meeting had gone well and that Mr. Lourie would approve the deal, it was swiftly rejected. Mr. Leach stated that Mr. Lourie told him that the "'decision was made over [his] head.'" (*Id*.) Mr. Leach related

that Mr. Lourie informed him that the decision to reject the agreement was made higher than the Assistant Attorney General for the Criminal Division, which meant it came from the Attorney General, the Deputy Attorney General, or the White House.

Finally, Siegelman had been voicing complaints that the Department of Justice's investigation was politically motivated as early as 2002. In a letter from Siegelman's then-counsel David Johnson to then-Deputy Attorney General Thompson and then-Director of the Executive Office of U.S. Attorneys Wainstein, Mr. Johnson, on behalf of Siegelman, alleged that the "resources of . . . [the] federal government[ ] [were] being used for the benefit of [Siegelman's] political opponents . . . ." (Doc. # 953, Ex. III-A at 7.) Mr. Johnson lamented the "insidious . . . political nature of [the] matter." (*Id*.) In a campaign letter dated September 14, 2005, sent by e-mail, Siegelman recited a then-recent survey which supposedly showed that 67% of voters believed that "the investigation of Don Siegelman [was] politically motivated." (Doc. # 953-36, Ex. III-H.)

The foregoing reveals that Scrushy was confronted with possible indications of selective prosecution well before trial and that Siegelman was arguing his selective prosecution defense to the public. But no motion ever was filed with the Court raising this issue and no "good cause" exists in this case for that failure. As a result, Defendant Scrushy has waived his selective prosecution claim. Fed. R. Crim. P. 12(b) & (e).

## 2.    Merits of the Selective Prosecution Claim

Even if the Court were to conclude that Scrushy had not waived his selective prosecution claim, the claim fails on its merits.  Scrushy maintains that he was selectively prosecuted for "mak[ing] political contributions to an issue-advocacy group . . . ."  (Doc. # 953 at 2.)  In order to prevail on his motion for new trial based on selective prosecution, Scrushy bears a "demanding burden" of demonstrating by "clear" evidence "that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose."  *United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 356 (October 3, 2011) (No. 11-5916).  Scrushy argues that he can establish the discriminatory effect element by demonstrating that other "similarly situated" comparators who were "contributors to issue-advocacy campaigns [ ] have rarely, if ever, been prosecuted."  (Doc. # 953 at 42.)  This argument, which rests entirely on the premise that Scrushy was making and Siegelman was receiving political contributions, altogether ignores the jury's determination that those "political contributions" were actually *bribes*. Thus, to satisfy the discriminatory effect element of his selective prosecution claim, Scrushy must demonstrate that other similarly situated individuals who were engaged in acts of bribery in substantially the same manner as him were not prosecuted for those actions.  In discussing comparators, the Eleventh Circuit has stated:

> [W]e define a "similarly situated" person for selective prosecution purposes as one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the

same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant.

*United States v. Smith*, 231 F.3d 800, 808 (11th Cir. 2000).

Scrushy fails to point to any other comparators who engaged in acts of bribery against whom the evidence of guilt was as strong or stronger than that against him but were not prosecuted for those acts. Scrushy's reliance on Georgia Thompson, Dr. Cyril Wecht, Justice Oliver Diaz, Judge Wes Teel, Judge John Whitfield and attorney Paul Minor as his comparators is misplaced. (Doc. # 953 at 8–9.) In his opinion denying Scrushy's motion for discovery on this issue, United States Magistrate Judge Charles Coody ("Judge Coody") concluded that these individuals cannot stand as comparators to Scrushy because they were all prosecuted. (*See* Doc. # 1070 at 6–8.) While not binding, the Court concludes that Judge Coody's reasoning is persuasive. Therefore, because Scrushy has failed to demonstrate an essential element of his selective prosecution claim—namely, that there exists similarly situated comparators—his claim fails.[5]

---

[5]   In *Smith*, the Eleventh Circuit, explaining similarly situated persons for purposes of a selective prosecution defense, emphasized that for a comparator to be similarly situated, the hypothetical prosecution of that comparator must "have the *same deterrence value* and [be] related in the same way to the Government's *enforcement priorities and enforcement plan* . . . ." 231 F.3d at 810 (emphasis added); *see also United States v. Lewis*, 517 F.3d 20, 27-28 (1st Cir. 2008) (stating that "[a] multiplicity of factors legitimately may influence the government's decision to prosecute one individual but not another"). Scrushy was charged with and convicted of bribing Alabama's highest ranking executive official. The high profile nature of the prosecution carries a strong deterrence value because it sends a loud message that bribery will not be tolerated at any level of government. Furthermore, the prosecution of such a case is of a high enforcement priority because of the fact that the official bribed is the state's highest ranking executive official. Although Scrushy's comparators are improper for other reasons (because they were all prosecuted), Scrushy also would have to demonstrate that a hypothetical prosecution of his comparators' non-prosecuted acts of bribery would carry the same deterrence value and match the same enforcement priority as Scrushy's act of bribery.

Finally, "selective prosecution is a defect in the institution of the prosecution that has *no bearing on the determination of factual guilt.*" *Jones*, 52 F.3d at 927 (emphasis added) (citing *Jennings*, 991 F.2d at 730). One of the elements Scrushy must prove to succeed on his motion for new trial is that "a new trial would probably produce a different result." *Jernigan*, 341 F.3d at 1287. Even assuming improper motivation on the part of the Government in its decision to bring charges, that taint does not extend, and in fact is presumed not to extend, to the jury's verdict. The jury is presumed to have followed the Court's instruction to consider only the law as delivered to it by the Court and the evidence submitted in the case. *See United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993) ("Few tenets are more fundamental to our jury trial system than the presumption that juries obey the court's instructions."). Scrushy points to no evidence to suggest that any evidence of selective prosecution prejudiced the jury. Hence, even if there existed "good cause" to grant relief from the waiver, Scrushy still would not be entitled to relief on his selective prosecution claim.

## B. Judicial Misconduct

Next, Scrushy argues that an *ex parte* meeting between the United States Marshals Service, as representatives of the Government, and the undersigned regarding certain e-mails purportedly sent between jurors constituted judicial misconduct in violation of Scrushy's Sixth Amendment rights to counsel and Fifth Amendment rights to due process. Although Scrushy now recasts the issue as one of judicial misconduct, this is not the first time this issue has been raised by the defendant. The specific facts of this issue are well-documented

in the Order by United States District Judge Robert L. Hinkle ("Judge Hinkle") addressing the defendant's motion to recuse.[6] *United States v. Siegelman*, 799 F. Supp. 2d 1246 (M.D. Ala. 2011 (Hinkle, J.). In a well-reasoned and detailed opinion, Judge Hinkle specifically rejected Scrushy's new trial claims based on allegations related to *ex parte* communications regarding the e-mails. Judge Hinkle concluded that "[t]he law of the circuit as set out in three decisions makes clear that under these circumstances, the judge's receipt of extrinsic evidence entitles the defendants to *neither a new trial* nor recusal of the judge." *Id.* at 1258 (emphasis added). Based on the law of the case doctrine, the facts as found by Judge Hinkle and his legal conclusions are dispositive of Scrushy's judicial misconduct claims.

> "As most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California,* 460 U.S. 605, 618 (1983) (dictum). This rule of practice promotes the finality and efficiency of the judicial process by "protecting against the agitation of settled issues." 1B J. Moore, J. Lucas, & T. Currier, *Moore's Federal Practice* ¶ 0.404[1], p. 118 (1984).

*Christianson v. Colt Industries Operating Corp.* 486 U.S. 800, 815–16 (1988) (internal citations omitted); *see also Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1313 (11th Cir. 2000) (same). The "law of the case" doctrine binds the district court and the Court of Appeals to findings of fact and conclusions of law made by the Court of Appeals in an earlier appeal of the same case. *See Ash v. Tyson Foods, Inc.*, No. 08-16135, 2011 WL 6270741,

---

[6] Judge Hinkle was assigned by the Chief Judge of the Eleventh Circuit to rule on the defendant's motion to recuse regarding the same subject matter now at issue in his motion for a new trial. (*See* Doc. 1007.)

at *6 (11th Cir. Dec. 16, 2011) (published) (citing *Friedman v. Market St. Mortg. Corp.*, 520 F.3d 1289, 1294 (11th Cir. 2008)). In addition, "[t]he law of the case doctrine bars relitigation of issues that were decided, either explicitly or by necessary implication, in an earlier appeal of the same case." *United States v. Jordan*, 429 F.3d 1032, 1035 (11th Cir. 2005); *see also United States v. Escobar-Urrego,* 110 F.3d 1556, 1560 (11th Cir. 1997) ("Under the law-of-the-case doctrine, an issue decided at one stage of a case is binding at later stages of the same case"). "The doctrine is based on sound public policy that litigation should come to an end and is designed to bring about a quick resolution of disputes by preventing continued re-argument of issues already decided." *McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1035 (10th Cir. 2000).

In his motion to recuse, Scrushy argued that the Court should disqualify itself from deciding the pending motions for new trial, or in the alternative, refer the motion to recuse to another judge. (Docs. # 550, 551.) In this Court's Memorandum Opinion and Order (Doc. # 1006) referring the recusal motions to another judge, this Court exercised its "discretion to transfer [the] recusal motion[,]" concluding that "justice would be best served by having another judge decide this motion." (*Id.* at 5.) The defendant sought and got exactly what he wanted: another judge to consider the motion to recuse in light of the evidence before the Court. Judge Hinkle did just that and rejected Scrushy's motion to recuse in light of the motion for new trial.

> A theme that runs through the defendants' motion to recuse is that the court
> handled the issue improperly—that it should have granted a new trial or at

13

least conducted or authorized a broader investigation. I disagree. And more importantly, the Eleventh Circuit has now disagreed. *See Siegelman II*, 640 F.3d at 1187. The importance of this cannot be overemphasized: the Eleventh Circuit has squarely rejected the defendants' position that the district court should have granted a new trial or at least conducted or authorized a broader investigation.

*United States v. Siegelman*, 799 F. Supp. 2d 1246, 1254 (M.D. Ala. 2011) (Hinkle, J.). The Court finds no reason to revisit factual and legal issues that were referred to and actually decided by another judicial officer. Such action would not serve justice or public policy.

More importantly, as noted by Judge Hinkle, the Eleventh Circuit has also previously considered the issue of the emails and determined that further investigation into the issue was not warranted. "We conclude, therefore, that the district court did not abuse its discretion in deciding that the purported emails, assuming they are authentic, do not entitle defendants to a new trial." *Siegelman,* 640 F.3d at 1186–87. That determination is binding on this Court.

Regardless of how these issues are framed, the arguments before Judge Hinkle on the motion to recuse are identical to those presently before this Court. For the reasons stated, including the depth of Judge Hinkle's analysis and the soundness of his conclusions, the Court finds no reason to revisit issues that have already been decided. Scrushy's motion for a new trial based upon the *ex parte* communications is due to be denied.

**C.    Disinterested Prosecutor**.

Scrushy argues that then-United States Attorney Canary's failure to honor her recusal[7] caused him to be "deprived of a disinterested prosecutor." In so framing the argument, Scrushy contends that the error is structural in nature and, thus, does not require him to demonstrate prejudice. *See United States v. Curbelo*, 343 F.3d 273, 280 (4th Cir. 2003) (structural errors "'invalidate the conviction' without any showing of prejudice."). Because structural errors "are so intrinsically harmful, if established [would] . . . require automatic reversal (*i.e.* 'affect substantial rights') without regard to their effect on the outcome." *Neder v. United States*, 527 U.S. 1, 7 (1999). Relying on *Young v. United States ex rel Vuitton et Fils S.A.*, 481 U.S. 787 (1987), Scrushy argues that the involvement of the United States Attorney after she recused herself rises to the level of a structural error requiring "reversal without regard to the facts or circumstances of the particular case." (Doc. # 953 at 53 (quoting *Young*, 481 U.S. at 808–09).) Scrushy is simply wrong.

While *Young* Court held that the appointment of an interested prosecutor was error, the facts of *Young* are easily distinguishable from the case at bar. In *Young*, the Court appointed as special prosecutors in a criminal contempt prosecution for aiding and abetting violations of a permanent injunction prohibiting infringement of manufacturer's trademark the same attorneys who represented the holders of the trademark in the civil action. The

---

[7] Because Scrushy frames the issue as one of recusal, the Court will refer to the issue as such. However, because his claim involves the United States Attorney, it is more properly a claim of Canary's failure to abide by her disqualification.

Court held that where "a prosecutor represents an interested party, . . . the ethics of the legal profession *require* that an interest other than the Government's be taken into account." *Id.* at 807.[8] Unlike in *Young*, United States Attorney Canary was not appointed specifically to prosecute this case. Moreover, she and her office represented the United States in this matter; they did not represent a private stakeholder.

Furthermore, twelve years later, the United States Supreme Court did not cite *Young* as one of those "very limited class of classes" warranting automatic reversal when discussing structural errors in criminal cases. The Court stated:

> We have recognized that "most constitutional errors can be harmless."
> *Fulminante, supra,* at 306. "[I]f the defendant had counsel and was tried by an
> impartial adjudicator, there is a strong presumption that any other
> [constitutional] errors that may have occurred are subject to harmless-error
> analysis." *Rose v. Clark,* 478 U.S. 570, 579 (1986). Indeed, we have found an
> error to be "structural," and thus subject to automatic reversal, only in a "very
> limited class of cases." *Johnson v. United States,* 520 U.S. 461, 468 (1997)
> (citing *Gideon v. Wainwright,* 372 U.S. 335 (1963) (complete denial of
> counsel); *Tumey v. Ohio,* 273 U.S. 510 (1927) (biased trial judge); *Vasquez v.
> Hillery,* 474 U.S. 254 (1986) (racial discrimination in selection of grand jury);
> *McKaskle v. Wiggins,* 465 U.S. 168 (1984) (denial of self-representation at
> trial); *Waller v. Georgia,* 467 U.S. 39 (1984) (denial of public trial); *Sullivan
> v. Louisiana,* 508 U.S. 275 (1993) (defective reasonable-doubt instruction)).

*Neder*, 527 U.S. at 8 (internal citations omitted).

Despite having the opportunity, the Supreme Court did not conclude that denial of a disinterested prosecutor rose to the level of a structural error.[9] Relying on *Young*, Scrushy

---

[8] Three Justices specifically disagreed that the appointment of an interested prosecutor amounted to a structural error. *Young v. United States ex rel Vuitton et Fils S.A.*, 481 U.S. 787, 826–27 (1987) (Powell, J., concurring in part and dissenting in part).

[9] Scrushy does not mention *Neder*, *supra*, in his argument on this issue. (*See* Doc. # 953 at 53–57.)

argues that he "is not required to prove prejudice." (Doc. # 953 at 58.) Consequently, Scrushy points to no prejudice he has suffered as a result of Canary's limited involvement in this case. His failure to do so dooms his claim, and his motion for new trial on this basis will be denied.

## D.    Prosecutorial Misconduct—Improper Juror Contacts & *Ex Parte* Communications

Scrushy also complains that the United States engaged in misconduct by failing to report 'improper' contacts with jurors, and that the United States Marshals, as employees of the Department of Justice, improperly engaged in *ex parte* communications with the undersigned.[10] (Doc. # 953 at 20.) These claims have been exhaustively addressed by this court, Judge Hinkle and the Eleventh Circuit. The Court will not belabor the point. Regardless of how he frames them, the issues related to the jurors and *ex parte* communication with the U.S. Marshal and Postal Inspectors have been addressed and resolved. For the same reason the Court concluded that Scrushy's claims of judicial misconduct lack merit, so do these claims of prosecutorial misconduct. Based on the law of the case doctrine, they are not properly before the Court now. *See Escobar-Urrego, supra*.

## E.    Prosecutorial Misconduct—*Brady*, *Giglio*, *Napue*, and Jencks Act Claims

Scrushy next assails the manner in which the Government prosecuted this case. Specifically, Scrushy contends that (1) the Government impermissibly shaped and scripted

---

[10] As previously noted, Scrushy also contends that prosecutors engaged in misconduct by improper witness coaching and withholding of impeaching and exculpatory evidence. Despite Scrushy's demarcation, these claims are more properly discussed in conjunction with his *Brady*, *Giglio*, *Napue*, and Jencks Act claims.

Bailey's testimony; (2) threatened Bailey and Loree Skelton, another Government witness, to force them to testify in a manner consistent with the Government's theory of the case; (3) concealed the number of meetings Bailey had with prosecutors and suppressed "302s" created by the FBI;[11] (4) failed to disclose that Bailey took notes in a notebook; (5) allowed Bailey to testify falsely; and (6) violated the Jencks Act.

Before the Court addresses each contention in turn, it is important to note that Scrushy's claims largely rely on the assumption that his motion for discovery would yield corroborating evidence. However, after a careful and thorough *in camera* review of all of the documents at issue, Judge Coody denied Scrushy's motion for discovery concluding "that the documents do not support Scrushy's position." (Doc. # 1070 at 23.) Consequently, relying only on the evidence before it, the Court concludes that Scrushy's motion for a new trial based on his allegations of prosecutorial misconduct is denied.

### 1. Testimony of Nick Bailey

Because the substance of Scrushy's claims rest on the testimony of Bailey, the Court begins with Bailey's testimony and ends with his sworn declaration. (Doc. # 953, Ex. V-H.) To say that Bailey testified at length at trial is an understatement. He testified for nearly five full days, including three days of exhaustively aggressive cross-examination by several lawyers. Bailey repeatedly described how Siegelman agreed to appoint Scrushy to the CON

---

[11] A "302" is an internal form used by the Federal Bureau of Investigations to summarize an interview conducted by the agency "where the results of the interview may become the subject of court testimony." *See* Federal Bureau of Investigation, *Manual of Investigative Operations and Guidelines*.

board in exchange for a $500,000 contribution to Siegelman's lottery campaign. (*See* Trial Tr. at 496–97, 500–502, 519–20, 545–47, 1152.)   During cross-examination, Bailey repeatedly denied that the Government scripted or shaped his testimony.  (Trial Tr. at 379, 555–56, 724, 931, 1163–65.) In his sworn declaration, Bailey recants *none* of this testimony. He does not state that he testified falsely.  (Doc. # 953, Ex. V-H.)  He does not claim that government agents or prosecutors threatened or pressured him to testify in a particular way, and he does not contend that he changed his account of events in any manner.  (*Id*.)  Nothing in his sworn statement suggests that the Government failed to disclose that Bailey changed his testimony in any material way.

Yet Scrushy contends that a number of hearsay statements made by Bailey to various third parties support granting a new trial. The Court disagrees.  New evidence claims based on recanted trial testimony is greeted with the "utmost suspicion." *United States v. Nolte*, 440 F.2d 1124, 1128 (5th Cir. 1971).[12]   Recanted testimony "upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction."  *In re Davis*, 565 F.3d 810, 825–26 (11th Cir. 2009) (quoting *Dobbert v. Wainwright*, 468 U.S. 1231, 1233–34 (1984) (Brennan, J., dissenting)).

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981.

Scrushy's claims related to Bailey's testimony fail for three reasons. First, Scrushy relies primarily on declarations of third parties repeating hearsay statements allegedly made by Bailey.[13] These statements, which seemingly call into question his trial testimony, are based on the declarants' perceptions and interpretations of Bailey's comments. For example, according to Pate,

> Based on my discussion with Nick, I have no doubt that the pressure, persuasion, and rehearsals to which Nick was exposed by the agents and prosecutors had a significant effect on the testimony he gave at the trials in which he testified, including the Siegelman/Scrushy trial. A week ago, Nick told me that he had just reread his testimony in the Siegelman/Scrushy trial and said, "I can't even believe I said those things." This comment stimulated yet another conversation between me and Nick about the testimony the government negotiated with him.

(Doc. # 953-60, Ex. V-E at ¶ 19.)

Because these declarations, based largely on hearsay, supposition, and speculation, are likely inadmissible at trial, Fed. R. Evid. 802, they, therefore, cannot serve as the basis for granting a new trial motion. *See Jernigan,* 341 F.3d at 1288 (finding that district court did not abuse discretion in concluding that newly discovered evidence would not produce a different result "because [the evidence] unquestionably was hearsay"); *Williams v. United States*, 239 F. App'x. 553, 557–58 (11th Cir. 2007) (denying Rule 33(b)(1) new trial motion because newly discovered evidence of a third party affidavit that was "replete with hearsay statements" and would not "produce a different result"); *Claritt v. Kemp*, 336 F. App'x. 869,

---

[13] The declarations come from Luther Stancil Pate (Doc. # 953-60, Ex. V-E), Harrison Hickman (Doc. # 953-61, Ex. V-F), and a transcript of an interview of Amy Methvin (Doc. # 953-57, Ex. V-D-2). Each declaration relates what Bailey allegedly told each individual after Bailey testified at trial.

870 (11th Cir. 2009) ("Newly discovered evidence consisting of evidence, especially affidavits containing hearsay, [is] suspect." (citing *Herrera, supra*)).

Second, the unreliable nature of these declarations is compounded by Bailey's failure to corroborate them in his declaration. *See Davis*, 565 F.3d at 825–26.[14] In his declaration, filed in support of Scrushy's motion for new trial, Bailey neither recants his trial testimony nor confirms the declarations of Pate and Hickman.[15] (*See* Doc. # 953-63, Ex. V-H.) Scrushy's attempt to buttress the hearsay statements with Tamarah Grimes's unsworn letter likewise fails, for courts are "loathe to consider" unsworn post-trial recantation affidavits and

---

[14] Scrushy correctly points out that the Supreme Court rejected the Eleventh Circuit's result in *Davis*. *See In re Davis*, No. 08-1443, 130 S. Ct. 1 (2009). But the Supreme Court's focus was on the lack of an evidentiary hearing assessing the reliability of recantation affidavits of numerous eyewitnesses. This case is easily distinguishable from *Davis* because *there is no direct recantation by Bailey*.

[15] With respect to the transcript of his alleged conversation with Methvin, during the trial, Bailey directly refutes the conversation. According to Methvin, she went to visit Bailey while he waited to testify at trial. During their conversation, in response to her statement that he sounded "like a robot," and that he had "this thing memorized," Bailey responded that "you would have it memorized, too, if you've heard the answers as many times as I've heard the answers." (Doc. 953-58, Ex. V-D-2 at 4). During his cross-examination, the following colloquy occurred.

Q: . . . isn't it far to say that your testimony in this courtroom has been scripted?
A: No, it isn't fair.
Q: Have you ever said that your testimony was scripted?
A: No.
Q: Is it fair to say that you know your testimony in this courtroom by heart?
A: What does by heart mean?
Q: That you've got it memorized front to back.
A: No, sir, I wouldn't say that at all.
Q: Have you ever said that to anyone?
A: Have I ever said that I know what by heart?
Q: That you've got your testimony memorized or that you know it by heart.
A: No, I don't recall ever saying that to anyone, sir. But as these questions become more and more repetitive, I am learning it by heart.

(Trial Tr. at 1163–64.) Clearly, the transcript of Methvin's conversation cannot be considered newly discovered evidence because the defendants were aware of and inquired about the possibility of memorized testimony during the trial.

21

"afford [them] . . . precious little weight, if any." *Davis*, 565 F.3d at 825–26. Third and finally, Judge Coody reviewed the evidence turned over by the Government and did not find *any* material that supports Scrushy's claims that the Government scripted or shaped Bailey's testimony. (*See* Doc. # 1070.)

In sum, after careful review of the evidence before it, the Court concludes that Scrushy has failed to demonstrate that he is entitled to a new trial because the "newly discovered" evidence would not produce a different result.[16] As a result, Scrushy's motion for a new trial is due to be denied on this basis.

### 2. Governmental Pressure on Bailey and Skelton to testify

Next, Scrushy contends that the Government neglected to disclose that it improperly pressured Bailey and Skelton to testify in a manner consistent with its theory of the case. As to Bailey, Scrushy asserts that the Government vowed to prosecute his brother and to publicly disclose embarrassing information about Bailey's personal life.[17] Scrushy also alleges that the Government made impermissible promises to Bailey regarding his sentence.

---

[16] In the alternative, Scrushy seeks an evidentiary hearing to more fully develop this claim. An evidentiary hearing is required when *credible* evidence suggests prosecutorial misconduct, *see Matthews v. United States*, 533 F.2d 900, 903 (5th Cir. 1976), or "to resolve conflicting evidence." *United States v. Velarde*, 485 F.3d 553, 549 (10th Cir. 2007). There is neither credible nor conflicting evidence in this case; there is no admissible evidence to support Scrushy's claims. His request for an evidentiary hearing is a wholly speculative fishing expedition.

[17] More specifically, Scrushy argues that the Government's conduct frightened Bailey (doc. # 953-60 at ¶¶ 12–13); that Bailey told Hickman that Bailey's brother was in a "situation" (Doc. # 953-61 at ¶ 10); and that Bill Long, an investigator for the Attorney General's office, told Bailey that his brother was "OK—for now" (Doc. # 953-62 at ¶ 18).

At trial, Bailey testified, under oath, that "[his] brother was never a [topic of] discussion in [his] conversations with the [G]overnment" (Tr. at 1000.) He further testified that he was not afraid to testify, and that he only hoped for a good sentencing recommendation from the Government because he testified *truthfully*. (*Id* at 378, 712–13, 999, 1177.) Bailey did not recant any of this testimony in his declaration. Scrushy was given ample opportunity to cross-examine Bailey—an opportunity of which he took full advantage. The jury was well aware that Bailey was testifying with the hope of receiving a recommendation from the prosecution for a light sentence. The law is clearly established that "[n]ewly discovered impeaching evidence does not justify a new trial." *United States v. Branca*, 677 F.2d 59, 61 (11th Cir. 1982); *United States v. Hirst*, 668 F.2d 1180, 1185 (11th Cir. 1982). At best, the evidence put forth in support of the motion for new trial is impeaching, and never has there been a witness more thoroughly subjected to impeachment cross-examination than Bailey.

As to his allegations related to Skelton, Scrushy again relies on Grimes' unsworn statements. This time he contends that the Government threatened to revoke Skelton's plea agreement unless she testified in a certain way. For the reasons already stated herein, Grimes's unsworn statements are insufficient to support Scrushy's claims. Furthermore, Skelton herself provides no declaration that would corroborate Scrushy's allegations that the Government coerced her testimony. On the other hand, the Government has provided sworn declarations that directly undermine Scrushy's speculative assertion. (*See* Docs. # 975-2 at

¶ 10 (Feaga Dec.); -3 at ¶ 7 (Fitzpatrick Dec.); -4 at ¶ 11 (Franklin Dec.); -5 at ¶ 3 (Garrett Dec.); -11 at ¶ 7 (Pilger Dec.); -12 at ¶ 7 (Perrine Dec.).) Consequently, Scrushy's claim as to Skelton's testimony therefore fails as a matter of law.

### 3. Government Meetings with Bailey and missing FBI 302s

Scrushy claims that Bailey met with the prosecutors more often than the Government disclosed. Of course, a prosecutor has a duty to provide a criminal defendant with all evidence materially favorable to the defendant's defense. *Brady v. Maryland*, 373 U.S. 83 (1963). This duty extends to evidence relating to the credibility of a witness when the defendant's guilt or innocence may turn on that witness's credibility. *Napue v. Illinois,* 360 U.S. 264 (1959); *see also United States v. Bagley,* 473 U.S. 667 (1985) (no distinction between impeachment and exculpatory evidence). The law is clearly established that impeachment evidence falls well within the realm of *Brady* material which must be produced by the prosecution. *Bagley*, 473 U.S. at 676.

Judge Coody addressed this issue in his opinion on Scrushy's motion for discovery, and the Court sees no reason to revisit the issue here.

> During trial, Bailey testified that he met with prosecutors or agents "two or three dozen" times, and that the prosecutors were present at "less than two dozen" meetings. (*Id*. at 1090 & 1018). Relying on a *Sixty Minutes* interview, Scrushy alleges that Bailey now admits he spoke with prosecutors "60–70 times." Scrushy conveniently ignores Bailey's own declaration in which he admitted that while he "would estimate that [he] spoke with government prosecutors or agents approximately 60 to 70 times . . . a number of those meetings and conversations did not involve Governor Siegelman or Mr. Scrushy." (Doc. # 953, Ex. V-H, at 1, ¶ 4).

(Doc. # 1070 at 23.) For the reasons stated, Scrushy is entitled to no relief on this basis.

Scrushy further argues that the Government failed to turn over a number of 302s created by the FBI after the agency interviewed Bailey. Under the FBI's *Legal Handbook for Special Agents* and the *Manual of Investigative Operations and Guidelines*, agents *should* create a 302 "where the results of the interview may become the subject of court testimony." (emphasis added). But when an interview generates no new information, the agent is not required to generate another 302.

The Government provided five FBI 302s relating to Bailey's interviews with the agency, including one that was a composite 302 that contained information obtained from six separate meetings between Bailey and the FBI. Relying on Bailey's declaration, which lists at least seventeen meetings with at least one FBI agent in attendance, Scrushy argues that the Government's disclosures do not suffice because there "should" be more 302s. The Government disputes this number of course, and asserts that it only created an interview memorandum when a meeting with Bailey led to new information.

Based on Judge Coody's *in camera* review of the documents at issue, he concluded that no other 302s existed.

> The United States provided to the court for an *in camera* review all of the documents at issue. The court has now carefully reviewed those documents and concludes that the documents do not support Scrushy's position. Despite Scrushy's contention that there 'should' be more FBI 302s, there are not. The only documents not disclosed to the defense consist of internal prosecution memos related to the investigation or prosecution of this case and internal correspondence concerning relationships among and between the prosecutors. These documents do not contain exculpatory information. *See* Fed.R.Crim.P. 16(a)(2).

(Doc. # 1070 at 23–24.)

Moreover, the jury was well aware that Bailey met with prosecutors and agents multiple times as he was cross-examined at length on this very question. Such possible discrepancies in the number of times Bailey met with agents is not material and would not require a require a new trial.

### 4. Bailey's missing notebook

Scrushy claims that the Government failed to turn over a notebook containing notes that Bailey took during the investigation which would demonstrate that his testimony was improperly scripted. Judge Coody reviewed the notebook *in camera* and concluded that the "documents contain absolutely no indication in any form whatsoever that the government in any way shaped or caused Bailey to change his testimony." (*Id*. at 25–26.) Based on Judge Coody's findings, Scrushy's motion for a new trial on this issue clearly fails.

Even if the Court were to proceed under the unsupported assumption that the Government covertly scripted Bailey's testimony, Scrushy would not be entitled to a new trial. Bailey was subjected to aggressive cross-examination. Bailey admitted under oath that he had lied repeatedly to various parties to protect himself but he denied the charge that the Government scripted or shaped his testimony. An excerpt from Bailey's cross-examination will suffice to illustrate the point.

> Q:    And your testimony today is that you lied to your own lawyer, George Beck.
> A:    I did.
> Q:    And your testimony today is that you lied to Bobby Segall.
> A:    That's correct.

Q:     Mr. Bailey, before we close for the day, can you think of any reason why any member of this jury should believe a word you say?

A:     I am here to tell the truth. That's all I can tell you, Mr. McDonald. If you think for any reason that I will sit here today and lie about those people that I care about to save my own ass, you don't know me very well.

Q:     Well, let's talk about that then.

A:     Come on.

Q:     You lied to Bobby Segall.

A:     Okay. I admitted that.

Q:     You lied to George Beck.

A:     I admitted that as well.

Q:     You lied to Governor Siegelman.

A:     Yes, I did.

Q:     You lied to his wife.

A:     That's correct.

Q:     You lied to Judge U. W. Clemon, Chief Judge of the federal district?

A:     I made a lot of mistakes, Mr. McDonald, and I have told some lies for a number of reasons. Most of those were to protect people that I cared about. But today I am here to tell the truth. You keep asking your questions as many times as you want, and I am going to keep telling the truth until you're tired of hearing it.

Q:     You lied to Chief Judge U. W. Clemon? Yes or no.

A:     Again, I have lied a number of times leading up to this day for a number of reasons. I am here today to tell the truth and make it right.

        *       *       *

Q:     All right. Well, let's see if we can just wrap this up. Let's see if we can't get a list of the number of people Nick Bailey has lied to so we can all go to lunch. How about that? Matt Hart. You lied to him?

A:     Why don't you name the list and when you get to one I didn't lie to, I'll speak up, maybe.

Q:     Fair enough. Matt Hart, Bill Long, Julia Weller, Todd Brown. These are all U.S. attorneys. Catherine Hankins. She is will the U.S. IRS. Shirley Samaniego. She's with the FBI. Keith Baker. He's with the FBI. Jim Murray. He's with the FBI. Every single member of the June 21, 2004, grand jury. Every single member of the August 9, 2004, grand jury. Members of the prosecution team in addition to the ones I have identified. Jack Brennan, Governor Siegelman, Governor

Siegelman's wife. I think we had a big fight about Judge U. W. Clemon. I can't remember which way we came down on that.

(Trial Tr. at 803–04, 884.)

Thus, any evidence of scripting introduced to impeach him further would amount to cumulative evidence and, therefore, would not require a new trial. *See Routly v. Singletary*, 33 F.3d 1279, 1285–86 (11th Cir. 1994) (finding undisclosed evidence that would have allowed cumulative impeachment fails to satisfy *Brady* standard); *LeCroy v. Fla. Dep't of Corrections*, 421 F.3d 1237, 1266 (11th Cir. 2005) (declining to find *Brady* violation where state failed to disclose witness scripts because witness' testimony was true and evidence of guilt overwhelming); *Pederson v. Fabian*, 491 F.3d 816, 826 (8th Cir. 2007) (holding failure to disclose summary of witness testimony prepared by Government does not warrant a new trial).

### 5. Government's alleged failure to correct false testimony

The Government has a duty to correct false trial testimony, and must do so even when the testimony goes only to the witness's credibility. *See Napue*, 360 U.S. at 269. Relying on declarations of Hickman and P. David Richardson, Scrushy claims that the Government, in violation of *Napue,* failed to correct Bailey when he testified that his brother was never part of his discussions with the government. In his declaration, Hickman claims that Bailey claimed that "one or more prosecutors" told Bailey that his brother was in a "situation." (Doc. # 953-61 at ¶ 10.) In his declaration, Richardson claims that Bailey told him that Bill Long, a one-time investigator for the Attorney General's Office," that Bailey's brother was

"OK—for now" implying that Bailey's brother might be in trouble if Bailey did not cooperate. (Doc. # 953-62 at ¶ 18.) The declarations are inconsistent with Bailey's trial testimony which Bailey himself has never recanted. For the same reasons as previously stated, these declarations which are based on hearsay, supposition, and speculation, cannot serve as the basis for granting a new trial motion. *See Jernigan,* 341 F.3d at 1288.

### 6. Jencks Act violation

Finally, Scrushy alleges that, during meetings with Bailey, Assistant United States Attorney Julia Weller transcribed verbatim Bailey's statements and the Government's failure to disclose those notes constitutes a violation of the Jencks Act, 18 U.S.C. § 3005. The Jencks Act requires the Government to turn over any witness "statement" upon direct questioning. The Act defines a statement as including a recording or a transcription "which is a substantially verbatim recital of an oral statement" made by the witness. 18 U.S.C. § 3005(e)(2). "Substantially verbatim" means "using the nearly exact wording or phrasing the witness uttered during the interview," although recorded notes fall outside the Act if "only some of the exact wording is used." *Jordan*, 316 F.3d at 1255.

Relying on Bailey's declaration that Weller "typed constantly on her laptop," it was Bailey's "opinion that [she] took verbatim notes because she was the 'eyes and ears' of Leura Canary at these meetings." (Doc. # 953-63 at ¶ 6.) The Court ordered the United States to produce for an *in camera* review all documents related to Nick Bailey, and after a careful and exhausting review of the documents, Judge Coody concluded that there was contained therein

no such transcripts or notes. (*See* Doc. # 1070.)  Accordingly, Scrushy's new trial claim is

on this ground is due to be denied.

### III. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that Defendant Scrushy's

Motion for a New Trial (Doc. # 953) be and is hereby **DENIED**.

Done this the 24th day of January, 2012.


_____/s/ Mark E. Fuller_____
UNITED STATES DISTRICT JUDGE