IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION


UNITED STATES OF AMERICA          )
                                  )
        v                         )       CR. NO. 2:05cr119-MEF
                                  )              (WO)
DON EUGENE SIEGELMAN              )


**MEMORANDUM OPINION and ORDER**

Now pending before the court is defendant Don Eugene Siegelman's ("Siegelman")

motion for discovery.  (Doc. # 961).  The defendant seeks leave to conduct discovery to

support his motion for new trial filed pursuant to FED.R.CRIM.P. 33.  *See* Doc. # 960.

Siegelman asserts that the discovery he seeks is necessary "[i]n order to have a full and

meaningful opportunity to prove that he is entitled to a new trial on the grounds raised in his

motion for a new trial."  (Doc. # 961 at 1).  The United States opposes the defendant's

discovery motion asserting that his "theories for relief lack a firm evidentiary basis and [he]

merely seek[s] a court-ordered fishing expedition."  (Doc. # 975 at 51).

After reviewing the submissions and hearing argument of the parties, the court

ordered the United States to produce for an *in camera* review all documents that would be

responsive to the defendant's discovery requests. The court has carefully and thoroughly

reviewed all material provided by the United States.  The material does not further the

defendant's claims, does not contain exculpatory material, and contains nothing justifying

an evidentiary hearing. Accordingly, for the more detailed reasons that follow, the court

concludes that Siegelman's motion for discovery (doc. # 960) is due to be denied.

## STANDARD OF REVIEW

The court has broad discretion concerning whether to allow discovery on a Rule 33(b)

motion for new trial.[1] Siegelman argues, and the court agrees, that the standard for discovery

in the context of a motion for new trial pursuant to FED.R.CRIM.P. 33(b) is analogous to

discovery in a habeas corpus proceeding. *See* Doc. # 961 at 8.

> Discovery is authorized in habeas corpus cases, an analogous post-conviction
> proceeding. *See Blackledge* [*v. Allison*,] 431 U.S. [63] 81-82 [1977] . . . *citing*
> Rule 6 of the Rules Governing Habeas Corpus. Courts have authority to allow
> discovery based on the All Writs Act, 28 U.S.C. § 1651, a "legislatively
> approved source of procedural instruments designed to achieve the rational
> ends of the law" that "courts may rely upon . . . in issuing orders appropriate
> to assist them in conducting factual inquiries." *Harris v. Nelson*, 394 U.S.
> 286, 299, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969) (internal quotation marks and
> citations omitted). According to the Supreme Court, "where specific
> allegations before the court show reason to believe that the petitioner may, if

---

[1] The defendant's motion for discovery is inextricably tied to his motion for a new trial pursuant to FED.R.CRIM.P. 33.

> To succeed on a motion for new trial based on newly discovered evidence, the movant must
> establish that (1) the evidence was discovered after trial, (2) the failure of the defendant to
> discover the evidence was not due to a lack of due diligence, (3) the evidence is not merely
> cumulative or impeaching, (4) the evidence was material to issues before the court, and (5)
> the evidence is such that a new trial would probably produce a different result.

*United States v. Jernigan*, 341 F.3d 1273,1287 (11th Cir. 2003). *See also United States v. Schlei*, 122 F.3d
944, 991 (11th Cir. 1997); *United States v. Starrett*, 55 F.3d 1525,1554 (11th Cir. 1995). "The failure to
satisfy any of these elements is fatal to a motion for a new trial." *United States v. Lee*, 68 F.3d 1267, 1274
(11th Cir. 1995); *Schlei*, 122 F.3d 944 at 991.

Motions for new trial based on newly discovered evidence are highly disfavored in this Circuit and
"should be granted only with great caution." *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006)
(*en banc*). It is the defendant's burden to justify a new trial. *Id.*

the facts are fully developed, be able to demonstrate that he is" entitled to a new trial, "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Id.*; *see also United States v. Wolfson*, 413 F.2d 804, 808 (1969) (2d Cir. 1969) (in dictum, suggesting that *Harris* applies to Rule 33 motions); 26 James Wm. Moore et al., Moore's Federal Practice § 633.21[3], at 633-50 (3d ed. 2006) In fulfilling this duty, a district court has broad discretion to fashion discovery mechanisms suitable to the case before it.

*United States v. Velarde*, 485 F.3d 553, 560 (10th Cir. 2007).

Rule 6(a) of the Rules Governing § 2254 Cases provides that "[a] party shall be entitled to invoke processes of discovery available under Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." *See Bracy v. Gramley*, 520 U.S. 899, 909 (1997) ("Rule 6(a) makes it clear that the scope and extent of such discovery is a matter confided to the discretion of the District Court."). And, no due process problem exists with the federal habeas discovery standard. *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 70 (2009). "A habeas petitioner ... is not entitled to discovery as a matter of ordinary course." *Bracy*, 520 U.S. at 904. The requisite good cause is demonstrated when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief." *Id.* at 908-09 (citation omitted). "Thus, good cause for discovery cannot arise from mere speculation." *Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006). As discussed in *Velarde*, *supra*, the court will apply these principles to Siegelman's motion for discovery.

Siegelman also argues that, at a minimum, he is entitled to an evidentiary hearing to

develop facts sufficient to prove the allegations contained within his motion for a new trial. *See* Doc. # 961 at 2. It has long been the law in this circuit that "a motion for new trial may ordinarily be decided upon affidavits without an evidentiary hearing." *United States v. Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977). The only legitimate purpose of an evidentiary hearing within the context of a Rule 33 motion for new trial is "to resolve conflicting evidence." *See Velarde*, 485 F.3d at 549. No such conflicts exists.

## DISCUSSION

Siegelman argues that he is entitled to discovery on five discrete issues in support of his motion for a new trial. As stated by the defendant, the five areas of discovery are as follows:

(1)     Requests Relating to Issue I[2] (*Brady*[3]/*Giglio*[4]/*Napue*[5] Issue)
(2)     Requests Relating to Issue II[6] (Prosecutorial Misconduct)

---

[2] In his motion for new trial, Siegelman characterizes Issue I as:

> The Government's failure to produce exculpatory and impeaching information in its possession as to key witnesses and correct false or misleading testimony during trial violated Siegelman's rights under the Due Process Clause of the Fifth Amendment and the Government failed to comply with its obligations under the Jencks Act.

(Doc. # 960 at 2).

[3] *Brady v. Maryland*, 373 U.S. 83 (1963)

[4] *See Giglio v. United States*, 405 U.S. 150 (1963)

[5] *See Napue v. Illinois*, 360 U.S. 264 (1959).

[6] Siegelman sets forth Issue II as follows:

> Because of Prosecutorial Misconduct in this case, including improper contacts with jurors, improper *ex parte* communication with the court, and

> (3)  Requests Relating to Issue III[7] (*Ex Parte* Meeting Between Judge and Government
>
> (4)  Requests Relating to Issue IV[8] (U.S. Attorney Recusal)
>
> (5)  Requests Relating to Issue V[9] (Selective Prosecution)

(Doc. # 961 at 2-6).

The court addresses each domain of discovery requests seriatim.

**1.   *Brady, Giglio and Napue* Requests**.   In his motion for a new trial, Siegelman complains that the prosecutors improperly shaped and scripted the testimony of Nick Bailey ("Bailey"), threatened witnesses Bailey and Loree Skelton, failed to correct misleading testimony during the trial about how many times Bailey met with the government, and failed to turn over "missing FBI 302s."   (Doc. # 960 at 38-46).   According to Siegelman, the prosecutors' actions deprived him of his due process rights.

---

> improper conduct in preparing government witnesses to testify at trial and failure to provide *Brady* material, Siegelman was deprived of his Fifth Amendment right to a fair trial and his Sixth Amendment right to an impartial jury.

(Doc. # 960 at 14).

[7] Siegelman delineates Issue III as

> Failure to disclose *ex parte* communications and the existence of a secret investigative report on the authenticity of juror emails, a critical material fact in a motion then pending before the court, violated Siegelman's Sixth Amendment right to counsel and his Fifth Amendment right to due process.

(*Id*. at 19).

[8] Issue IV is described as "[t]he failure of the U.S. Attorney Leura Canary to abide by her announced recusal deprived Siegelman of his entitlement to a disinterested prosecutor."   (*Id*. at 23)

[9] Finally, Siegelman identifies Issue V as "Siegelman was selectively prosecuted for political purposes in violation of his Fifth Amendment right to equal protection of the laws and his First Amendment right to receive a contribution to an education lottery foundation he supported."   (*Id*. at 27-28).

Of course, a prosecutor has a duty to provide a criminal defendant with all evidence materially favorably to the defendant's defense. *Brady v. Maryland*, 373 U.S. 83 (1963). This duty extends to evidence relating to the credibility of a witness when the defendant's guilt or innocence may turn on that witness's credibility. *Napue v. Illinois,* 360 U.S. 264 (1959). *See also United States v. Bagley,* 473 U.S. 667 (1985) (no distinction between impeachment and exculpatory evidence). The law is clearly established that impeachment evidence falls well within the realm of *Brady* material which must be produced by the prosecution. *Bagley*, 473 U.S. at 676.

The court first addresses Siegelman's contention that the government failed to reveal threats it made to witness Loree Skelton. Siegelman's entire argument regarding Skelton is as follows:

> While there were, in fact, other witnesses against Scrushy (including witness Skelton, who was also threatened, according to the Grimes[10] letter to Attorney General Holder (Scrushy EXHIBIT III-K at 3)), none could provide testimony even remotely comparable to Bailey's as to the key element of the offense charged.[11]

---

[10] Tamarah Grimes was a paralegal with the United States Attorney's office for the Middle District of Alabama who, in 2009, made numerous accusations against the United States Attorney, and others regarding the prosecution of defendants Siegelman and Scrushy. As a result of these allegations, the Attorney General of the United States and the Office of Special Counsel investigated the allegations and concluded that they were unfounded.

One of the allegations that Grimes made was that the prosecutors threatened to revoke the plea agreement of Skelton "unless [she] agreed to testify in a certain manner to support Nick Bailey's meeting-check-conversation testimony." (Doc. # 960 at 12). According to Grimes, if Skelton did not testify in a manner acceptable to the prosecutors, the prosecutors would conclude that she had not "fully cooperated" with them. (*Id.*)

[11] Siegelman adopted Scrushy's motion for new trial, *see* doc. # 960 at 2, fn. 2, and copied Scrushy's motion for discovery. *See* Doc. # 961. Siegelman also relied on the evidentiary material submitted by Scrushy in support of his motion. *See* Doc. # 960 at 2, fn 2 ("Defendant Siegelman has not attached the same

(Doc. # 960 at 45) (footnotes added). Siegelman relies entirely on the letter from Grimes to support his allegations regarding Skelton. His reliance is misplaced. Grimes' allegations are based on hearsay, speculation, and insinuation which are simply insufficient to support a motion for discovery. *See Arthur*, 459 F.3d at 1311 (mere speculation does not rise to good cause to justify discovery on a motion for new trial).

The gravamen of Siegelman's arguments center around the testimony of Nick Bailey.[12] Siegelman contends that newly discovered evidence suggests that Bailey's testimony was scripted by the government, and that the government used threats and promises to shape Bailey's testimony. Siegelman further argues that newly discovered evidence demonstrates that Bailey met with the prosecutors many more times than Bailey testified about at trial, and that the government failed to correct Bailey's erroneous testimony on this issue. Finally, Siegelman contends that, based on the number of times Bailey met with government agents, there must be more FBI 302s and notes that the government did not turn over to the defense. According to Siegelman, these actions violate *Brady, Giglio,*

---

documents in an effort to avoid duplication and overburdening an already voluminous records. Given Defendant Siegelman's assumption that this Court will likely consider both his motion and Defendant Scrushy's motion for a new trial together, Siegelman adopts the Exhibits filed by Scrushy and attached to his motion for new trial.") Consequently, many of Siegelman's arguments are copied verbatim from Scrushy's briefs and citations to the evidence are from documents filed by Scrushy.

[12] Bailey started working Siegelman in 1994 in Siegelman's campaign for Lieutenant Governor. (Doc. # 892 at 382-83). Bailey served Siegelman in a number of capacities including driver and administrative aide. (*Id*.) After Siegelman was elected Governor, Bailey was Siegelman's executive secretary until he was appointed as the acting director of the Alabama Department of Economic and Community Affairs ("ADECA"). (*Id*. at 430).

*Napue*, and the Jencks Act.[13]  Siegelman relies on a declaration by Bailey, a transcript of a *Sixty Minutes* news show during which Bailey was interviewed while he was incarcerated, and the declarations of others[14] to assert that new evidence now exists to support his claims.

The government denies Siegelman's allegations.  More importantly, however, Siegelman was well aware that Bailey met with prosecutors and agents a number of times prior to trial to discuss his testimony because, at trial, defense counsel attacked Bailey's credibility and veracity on these matters.  Bailey testified in this case for three and a half days.  His testimony encompasses over eight hundred (800) pages of trial transcript.  During cross-examination, Bailey repeatedly denied that the prosecution scripted his testimony. (Doc. # 892, Tr. Transcript at 379, 555-56, 724, 931, 1163-65).  In his declaration filed in support of Scrushy's motion for a new trial, Bailey does not state that he testified falsely. (Doc. # 953, Ex. V-H).  He does not claim that government agents or prosecutors threatened or pressured him, and he does not contend that he changed his account of events in any manner previously undisclosed to the defense.  (*Id*.)

With no help from Bailey, Siegelman depends on the declarations of Luther Stancel Pate, Robert Harrison Hickman, and Amy Methvin to support his claims that Bailey's trial testimony was scripted and that he was pressured by the government to testify falsely. Siegelman's reliance is wholly misplaced.  The declarations of Pate, Hickman and Methvin

---

[13]  *See* 18 U.S.C. § 3500(b).

[14]  Siegelman relies on the declarations of Luther Stancel Pate, Brad Garrett, Robert Harrison Hickman, and Amy Methvin.

are not only replete with inadmissible hearsay and not based on personal knowledge, but are premised on these persons' interpretations and perceptions of Bailey's thoughts, actions and motives. For example, in his declaration, Luther Pate asserts that

> [b]ased on many, many conversations with Nick over the past 8 years, I have no doubt that he was both intimidated and manipulated by the government into giving testimony at the Siegelman/Scrushy trial that Nick wasn't sure was true. Nick said as much himself in our recent conversation when he said he "can't believe" what he said in his own testimony.

(Doc. # 953-60, Ex. V-E at 10-11, ¶ 19). These declarations are inconsistent with Bailey's trial testimony which Bailey himself has never recanted. Consequently, the declarations of Pate, Hickman and Methvin are unreliable and suspect. *See Herrera v. Collins*, 506 U.S. 390, 417 (1993); *Claritt v. Kemp*, 336 Fed. Appx. 869, 870 (11th Cir. 2009); *Williams v. United States*, 239 Fed. Appx. 553, 558 (11th Cir. 2007).

During trial, Bailey testified that he met with prosecutors or agents "two or three dozen" times, and that the prosecutors were present at "less than two dozen" meetings. (Doc. # 892 at 1090 & 1018). Relying on a *Sixty Minutes*[15] news interview, Siegelman alleges that Bailey now admits he spoke with prosecutors "60-70 times." Siegelman conveniently ignores Bailey's own declaration in which he admitted that while he "would estimate that [he] spoke with government prosecutors or agents approximately 60 to 70 times . . . a number of those meetings and conversations did not involve Governor Siegelman or Mr. Scrushy." (Doc. # 953, Ex. V-H, at 1, ¶ 4). The jury was well aware that Bailey met with prosecutors

---

[15] *Sixty Minutes* is a long-running news program that airs on the CBS Broadcasting, Inc. (CBS).

and agents multiple times, and that Bailey was testifying with the hope of receiving a recommendation from the prosecution for a light sentence. Such possible discrepancies in the number of times Bailey met with agents is not material and would not require a require a new trial.

Nonetheless, based at least in part on this numerical discrepancy, Siegelman argues that the United States failed to turn over all notes and FBI 302 reports and seeks an opportunity to review the government's documents. The United States provided to the court for an *in camera* review all of the documents at issue. The court has carefully reviewed those documents and concludes that the documents do not support Siegelman's position. Despite Siegelman's contention that there 'should' be more FBI 302s, there are not.[16] The only documents not disclosed to the defense consist of internal prosecution memos related to the investigation or prosecution of this case and internal correspondence concerning relationships among and between the prosecutors. These documents do not contain exculpatory information. *See* FED.R.CRIM.P. 16(a)(2).

Finally, to the extent that Bailey's declaration can be considered an attempt to recant

---

[16] Siegelman also contends that there should be typed notes from Assistant United States Attorney Julia Weller because Bailey stated in his declaration that Weller "typed constantly on her laptop. My opinion is that Ms. Weller took verbatim notes because she was the 'eyes and ears' of [recused U.S. Attorney] Leura Canary at these meetings." (Doc. # 960 at 49). Unfortunately for Siegelman, Bailey was simply wrong. The court has laboriously reviewed the documents provided to it by the government related to this issue. This is not a case in which there is any conflicting evidence; there is *no* evidence to support the defendant's supposition that Weller was taking notes. This is not a matter of withholding any documents; there are no other documents.

his trial testimony, Siegelman's argument fails.[17]   "Skepticism greets any recantation of testimony by a witness in a criminal case, because where a witness later recants testimony given at trial, "the witness either is lying now, was lying then, or lied both times.'" *United States v. Earles*, 983 F.Supp. 1236 (N.D. Iowa 1997), *aff'd sub nom, United States v. Papajohn*, 212 F.3d 1112 (8th Cir. 2000).[18]  Siegelman has failed to show that Bailey perjured himself or that the government failed to correct any allegedly false testimony.  *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002).

In furtherance of his quest for discovery, Siegelman argues in his motion for new trial (doc. # 960) about a notebook belonging to Bailey.

> Multiple sources, including Nick Bailey himself, confirm the existence of a notebook which Bailey used during his interviews and trial preparation. Scrushy EXHIBITS V-E, F, G & H. Through counsel, Bailey has voluntarily provided a limited number of pages of that notebook, as well as discussed its contents during interviews with Defendant's investigators at which the notebook was present and in the custody of Bailey's attorney, as set out in the Declaration of David Richardson, attached . . . Scrushy EXHIBIT V-G.

(Doc. # 960 at 47).

Siegelman contends that "[i]t is self-evident that the entire notebook is of great significance to Defendant's motion for new trial" because it "certainly contains evidence of the Government's activities in shaping and changing Bailey's testimony from its original

---

[17]  Bailey's testimony cannot even be described as recanted.  In his declaration, Bailey does not allege that he testified falsely in any respect.  He does not assert that the government threatened him or pressured him.

[18]In addition to the recantation issue this case also involved an issue of the admissibility of grand jury testimony of trial witnesses.  The court's holding on that question was abrogated by *Crawford v. Washington*, 541 U.S. 36 (2004).

version to the version that was used at trial." (*Id.* at 47-48). Pursuant to the order of the court (doc. # 1040), the former attorney for Nick Bailey produced to the court for *in camera* inspection the contents of the notebook which are still in existence. The court has carefully reviewed these documents which contain absolutely no indication in any form whatsoever that the government in any way shaped or caused Bailey to change his testimony.

The notebook documents primarily consist of handwritten notes written by Bailey. A comparison of these notes with Bailey's testimony at trial shows that in some instances the trial testimony contains more elaboration of the factual situations about which Bailey testified. The court emphasizes that these elaborations do not show contradictions between the notes and Bailey's testimony. But even so, at best the material could be considered impeaching, and it is well established that "[n]ewly discovered impeaching evidence does not justify a new trial." *United States v. Branca*, 677 F.2d 59, 61 (11th Cir. 1982); *United States v. Hirst*, 668 F.2d 1180, 1185 (11th Cir. 1982). The materials were never in the possession of the government, so *Bagley*, *supra,* does not apply. The court concludes that Siegelman's motion for discovery on this issue is due to be denied.

**2. Prosecutorial and Judicial Misconduct**.[19] Siegelman next complains that he was

---

[19] Siegelman also complains that the United States engaged in misconduct by failing to report 'improper' contacts with jurors, and participating in *ex parte* communications with Chief Judge Fuller. These issues have previously been addressed and based on the law of the case doctrine, are not properly before the court now. *See United States v. Escobar–Urrego,* 110 F.3d 1556, 1560 (11th Cir. 1997). Thus, the court declines to revisit these issues.

deprived of a fair trial because of prosecutorial and judicial misconduct.[20] Siegelman asserts

that the Court engaged in judicial misconduct when it communicated *ex parte* with the

United States Marshal and the United States Postal Inspectors about certain e-mails

purportedly sent between jurors during the trial. Siegelman further asserts that because these

agencies are governmental agencies, the contact also constitutes prosecutorial misconduct.

According to Siegelman, "[t]he prejudice to Defendant is manifest and obvious."[21] (Doc. #

960 at 55). The court disagrees, and this is not the first time this issue has been addressed

and rejected.

> A theme that runs through the defendants' motion to recuse is that the court
> handled the issue improperly – that it should have granted a new trial or at
> least conducted or authorized a broader investigation. I disagree. And more
> importantly, the Eleventh Circuit has now disagreed. *See Siegelman II*, 640
> F.3d at 1187 (11th Cir. 2011). The importance of this cannot be
> overemphasized: the Eleventh Circuit has squarely rejected the defendants'
> position that the district court should have granted a new trial or at least
> conducted or authorized a broader investigation.

*United States v. Siegelman*, 799 F.Supp.2d 1246, 1254 (M.D. Ala. 2011) (Hickle, J.).

After fully discussing the defendants' claims regarding Judge Fuller's receipt of

extrinsic information from the United States Marshal and his *ex parte* communications with

United States Postal Inspectors regarding several emails that were allegedly written by and

sent to jurors, United States District Judge Hinkle specifically rejected the defendant's new

---

[20] Notwithstanding the delineation by Siegelman, the court considers his requests for discovery in
support of his claims of prosecutorial and judicial misconduct in toto.

[21] Siegelman ascribes a malevolent motive to the United States which is unsupported by the record.

trial claim on this basis. "[U]nder these circumstances, the judge's receipt of the extrinsic evidence entitled the defendants to neither a new trial nor recusal of the judge." *Id.* at 1258. Judge Hinkle concluded that the defendants' motion to recuse based on the *ex parte* communications was unfounded. *Id.* at 1261.

More importantly, however, the Eleventh Circuit has considered the issue of the emails and determined that further investigation into the issue was not warranted.

> Permission to attack jury verdicts by postverdict interrogations of jurors would allow defendants to launch inquiries into jury conduct in the hope of discovering something that might invalidate the verdicts against them.
>
> *      *      *
>
> We conclude, therefore, that the district court did not abuse its discretion in deciding that the purported emails, assuming they are authentic, do not entitle defendants to a new trial.

*United States v. Siegelman,* 640 F.3d 1159, 1186-87 (11th Cir. 2011). That determination is binding precedent on this court.

Although Siegelman reframes the issue now to allege that Judge Fuller engaged in judicial misconduct by communicating with the United States Marshal and United States Postal Inspectors about their investigations into these emails, the conclusions of the Eleventh Circuit and Judge Hinkle's findings of fact and conclusions of law are the law of the case and binding on this court. "The law of the case doctrine bars relitigation of issues that were decided, either explicitly or by necessary implication, in an earlier appeal of the same case." *United States v. Jordan*, 429 F.3d 1032, 1035 (11th Cir. 2005). *See also United States v.*

*Escobar–Urrego,* 110 F.3d 1556, 1560 (11ᵗʰ Cir. 1997) ("[u]nder the law-of-the-case

doctrine, an issue decided at one stage of a case is binding at later stages of the same case").

Siegelman argues that

> this Court must hold an evidentiary hearing at which all aspects of this *ex parte*
> communication can be explored . . . Thereafter, it will be the Government's
> burden to demonstrate a compelling state interest for the event or events and
> to meet its "heavy burden" of proving that Defendant was not prejudiced.

(Doc. # 960 at 60).

Siegelman is simply wrong.  It is not the government's burden to demonstrate that he

was not prejudiced.[22]  Because motions for new trial based on newly discovered evidence are

highly disfavored in this Circuit,  it is the defendant's burden to demonstrate that he has been

prejudiced and that a new trial is warranted.  *United States v. Campa*, 459 F.3d 1121, 1151

(11ᵗʰ Cir. 2006).  In this case, Siegelman does not identify *any* prejudice that he has allegedly

suffered.

Siegelman filed a motion to recuse after he filed his motion for new trial.  He sought

to have another Judge review this matter which has now happened.  Judge Hinkle has

rejected Siegelman's claims as has the Eleventh Circuit.  The court should not, and will not

revisit this issue.  Accordingly, the court will deny the motion for discovery on this issue.

### 3.  United States Attorney Recusal.  Siegelman argues that United States Attorney

---

[22]  Siegelman relies on *In re Taylor*, 567 F.2d 1183, 1188 (2ⁿᵈ Cir. 1977) to support his position. *In re Taylor* involved *in camera* proceedings related to grand jury proceedings.  The case at bar is in a far different posture procedurally and Siegelman is proceeding on a motion for discovery in support of a motion for new trial.  Thus, *In re Taylor* is inapposite and does not provide support for Siegelman's position.

Leura Canary's failure to honor her recusal[23] caused him to be deprived of "a disinterested prosecutor."  (Doc. # 960 at 60-64).  In so framing the argument, Siegelman contends that the error is structural in nature and thus, does not require him to demonstrate prejudice.  *See United States v. Curbelo*, 343 F.3d 273, 280 (4th Cir. 2003) ( structural errors ""invalidate the conviction" without any showing of prejudice.")  Because structural errors "are so intrinsically harmful, if established [would] . . . require automatic reversal (*i.e.* "affect substantial rights") without regard to their effect on the outcome."  *Neder v. United States*, 527 U.S. 1, 7 (1999).  Relying on *Young v. United States ex rel Vuitton et Fils S.A.*, 481 U.S. 787 (1987), Siegelman argues that "[i]f Scrushy is correct, and it is assumed without proof to the contrary that, the actions of U.S. Attorney Canary deprived Siegelman of his right to a disinterested prosecutor."  (Doc. # 960 at 64).

Unfortunately for Siegelman, his assumption is incorrect.  Not only does Siegelman improperly attempt to shift the burden of proof to the government, but the facts of *Young* are easily distinguishable from the case at bar.  In *Young*, the court appointed as special prosecutors in a criminal contempt prosecution for aiding and abetting violations of a permanent injunction prohibiting infringement of manufacturer's trademark the same attorneys who represented the holders of the trademark.  The Court held that where "a prosecutor represents an interested party, . . . the ethics of the legal profession *require* that

---

[23] Because Siegelman frames the issue as one of recusal, the court will refer to the issue as such. However, because his claim involves the United States Attorney, it is more properly a claim of Canary's failure to abide by her disqualification.

an interest other than the Government's be taken into account." *Id*. at 807.[24] United States

Attorney Canary was not appointed specifically to prosecute this case. Moreover, she and

her office represented the United States in this matter; they did not represent a private

stakeholder.

Furthermore, twelve years later, the United States Supreme Court did not cite *Young*

as one of those "very limited class of classes" when discussing structural errors in criminal

cases.

> We have recognized that "most constitutional errors can be harmless."
> *Fulminante, supra,* at 306, 111 S.Ct. 1246. "[I]f the defendant had counsel and
> was tried by an impartial adjudicator, there is a strong presumption that any
> other [constitutional] errors that may have occurred are subject to harmless-
> error analysis." *Rose v. Clark,* 478 U.S. 570, 579, 106 S.Ct. 3101, 92 L.Ed.2d
> 460 (1986). Indeed, we have found an error to be "structural," and thus subject
> to automatic reversal, only in a "very limited class of cases." *Johnson v. United
> States,* 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citing
> *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)
> (complete denial of counsel); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71
> L.Ed. 749 (1927) (biased trial judge); *Vasquez v. Hillery,* 474 U.S. 254, 106
> S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand
> jury); *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122
> (1984) (denial of self-representation at trial); *Waller v. Georgia,* 467 U.S. 39,
> 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); *Sullivan v.
> Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective
> reasonable-doubt instruction)).

*Neder*, 527 U.S. at 8.

Despite the opportunity, the Supreme Court did not conclude that denial of an

---

[24] Three Justices specifically disagreed that the appointment of an interested prosecutor amounted to a structural error. *Young v. United States ex rel Vuitton et Fils S.A.* 481 U.S. 787, 826-27 (1987) (Powell, J., *concurring in part and dissenting in part*.)

disinterested prosecutor rose to the level of a structural error.[25]  Consequently, Siegelman's

reliance on *Young* is misplaced, and he must therefore demonstrate "good cause" to obtain

discovery on this issue.  Specifically, Siegelman must state "specific allegations . . . [that]

show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate

that he is ... entitled to relief." *Bracy*, 520 U.S. at 908-09.  This he has not done.  The United

States Attorney recused herself from this matter and was screened from the prosecution of

this case.  There is no evidence that the "wall" erected between the United States Attorney

and the prosecution team was breached in any significant or material manner.

　　While it is undisputed that several emails indicated Canary's interest in the case, there

is no evidence that these messages in any way influenced or directed any actions taken by the

Acting United States Attorney or other prosecutors in this case.  The first email, dated April

6, 2005, was from First Assistant Patricia Snyder informing the Chief of the Civil Division,

Stephen Doyle, that paralegal, Tamarah Grimes would be assigned to the criminal division

to help on this case.  The second email, dated September 15, 2005, was from Canary to

administrative staff about a contract employee working on this and other cases.  There is no

evidence that this email was sent to any member of the prosecution team.  The third email,

dated September 19, 2005, was from Canary to members of the prosecution team, forwarding

an email she received from the defendant himself.  In the email, Canary suggests the

possibility of seeking a 'gag' order to prohibit Siegelman from speaking to the press.  The

---

[25]  In his motion for new trial, Siegelman neither discusses nor distinguishes *Neder*, *supra*.

prosecutors did not seek a 'gag' order and took no action on Canary's suggestion.

On January 26, 2005, Canary did send an email to the Department of Justice reiterating her support of additional and continued funding of this case. Canary had previously received a copy of an email, dated November 1, 2005, indicating that a request for funding had been granted. An undated email indicates that Canary would be briefed on an issue involving funding of this litigation. Finally, the defendants point to a February 23, 2003 memorandum from Canary to the Department of Justice seeking additional funding for this litigation.

At oral argument on the motion for discovery on November 2, 2011, the defendant asserted, for the first time, that when Canary interjected herself into issues of allocation of resources for this case and within the office, she was acting with prosecutorial authority that infected the prosecution of this case. According to the defendant, resource allocation is "the heart of the United States's Attorney's authority" and, thus, her involvement after recusing herself undoubtedly impacted this prosecution. Unquestionably, discretionary decisions about prosecutions entail consideration of how to allocate scarce resources. Siegelman's resource allocation argument does not bear the weight he places on it. Siegelman argues that Canary's involvement undoubtedly impacted this prosecution. But the facts show that the decision to prosecute Siegelman had already been made. Indeed, Siegelman laments in another form that very decision to prosecute complaining that it was made "over the head" of the chief of the Department of Justice's Public Integrity Section. Canary recused herself

in 2002. Three of the four communications about which Siegelman complains occurred in 2005.[26] During that time, with the exception of a September 19, 2005 email from Siegelman that Canary forwarded to the prosecutors, Canary's involvement was limited to narrow funding issues and personnel matters. Siegelman points to no prejudice he suffered as a result of Canary's communications. He provides the court with no credible evidence that the United States Attorney directed, managed, influenced or controlled any aspect of the prosecution of the case. Her minimal involvement in the allocation of resources within the United States Attorney's office does not show that she was involved in the prosecution of this case but rather that the conduct of the case had an impact on the other business of the office. This is not a case in which Canary engaged in extensive misconduct during the investigation or involved herself in the direct supervision of the prosecution. *See United States v. Omni Int'l Corp.*, 634 F.Supp. 1414 (D.C. Md. 1986).

Conduct that may be "inappropriate does not necessarily rise to the level of deprivation of a fair trial." *See United States v. Canino*, 949 F.2d 928 (7th Cir. 1991). While it might have been better if Canary had not involved herself in any manner with the trial of this case, Siegelman has not demonstrated that he was deprived of a fair trial by her actions. He has not alleged, and he cannot show, that her actions in any way affected the trial of this case, or somehow infected the jury. Siegelman is entitled to a fair trial, not a perfect one. *See United States v. Ramirez*, 426 F.3d 1344, 1353 (11th Cir. 2005). Accordingly, the

---

[26] The other communication was the February 23, 2003 memorandum from Canary to the Department of Justice.

defendant's motion for discovery on this issue will be denied.

**4. Selective Prosecution**.  Finally, Siegelman contends that he was selectively prosecuted as a result of a politically motivated investigation and prosecution, thereby depriving him of a fair trial.  (Doc. # 960 at 64-70).  In order to prevail on his motion for new trial based on selective prosecution, Siegelman bears a "demanding burden" of demonstrating by "clear" evidence "that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S.Ct. 356 (October 3, 2011) (No. 11-5916). "[I]n order to obtain discovery in support of such a claim, a defendant must provide "some evidence tending to show the existence of the essential elements of the defense." *Id*.  The standard for obtaining discovery on this claim is especially rigorous.  *United States v. Armstrong*, 517 U.S. 456, 468 (1996) ("The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim").

> [I]n order to establish [his] selective prosecution claim, [the defendant is] required to show that [his] prosecution had a discriminatory effect, i.e., that similarly situated individuals were not prosecuted, and [he was] also required to show that the difference in treatment, or selectivity of the prosecution, was motivated by a discriminatory purpose.

*United States v. Smith*, 231 F.3d 800, 809 (11th Cir. 2000).

Because Siegelman must make "a credible showing of different treatment of similarly situated persons, " the court turns to the question of what constitutes "similarly situated

persons." *Armstrong*, 517 U.S. at 470.

> [W]e define a "similarly situated" person for selective prosecution purposes as one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant – so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan – and against whom the evidence was as strong or stronger than that against the defendant.

*Smith*, 231 F.3d at 810.

Simply put, to be successful on his selective prosecution claim, Siegelman "must establish that the government could prove beyond a reasonable doubt that someone else had engaged in the same type of conduct, committing the same crime in that or substantially the same manner." *Id.* at 811. He does not make this showing.

Siegelman contends that while he was prosecuted in this case, "similarly situated Republicans were neither investigated nor prosecuted." (Doc. # 960 at 69). This argument echos Siegelman's defense during trial that his actions were not illegal but that the statute under which he was charged violated his First Amendment rights to run an "issue-advocacy campaign." *See* Doc. # 906 at 68. This defense was unsuccessful at trial as evidenced by the jury verdict. And it has been unsuccessful on appeal. Consequently, Siegelman stands convicted of bribery, and he must demonstrate that other individuals who engaged in similar acts of bribery were not prosecuted. This he fails to do. Siegelman does not identify a single comparator.[27] He fails to identify any person who committed bribery but was not prosecuted.

---

[27] Even if the court were to consider the comparators identified by co-defendant Scrushy in his motion for new trial, *see* Doc. # 953, Siegelman would be entitled to no relief. Scrushy identified Georgia

Siegelman has failed to meet the rigorous standard justifying discovery in aid of his selective

prosecution claim.

---

Thompson, Dr. Cyril Wecht, Justice Oliver Diaz, Judge Wes Teel, Judge John Whitfield and attorney Paul Minor as his comparators. See Doc. # 953 at 8-9 ("All of these cases parallel the pattern of politicized prosecutions against prominent Democrats or supporter of Democratic candidates or their causes based on questionable facts and/or aggressive legal theories, timed to have maximum impact on political races in progress, just as occurred in the instant case.") Siegelman refers to these individuals in his recitation of the facts, but does not discuss them as comparators in his argument.

    However, these comparators avail Siegelman nothing because they were all prosecuted. In order to be successful on his selective prosecution claim, Siegelman must identify others who engaged in the same or similar criminal action (i.e. committed acts of bribery) but were not prosecuted.

    The prosecution of Georgia Thompson is a good example of the problem with Siegelman's argument. "Thompson steered [a] contract to Adelman Travel, the low bidder, even though other members of the selection group rated its rivals more highly. A jury convicted Thompson of violating 18 U.S.C. § 666 and § 1341." *United States v. Thompson,* 484 F.3d 877, 878 (7th Cir. 2007). The prosecution's § 666 theory was that Thompson "intentionally misapplie[d]" more than $5,000 by diverting it from another bidder to Adelman Travel. *Id.* at 880. About this theory, the Seventh Circuit said

> Section 666 is captioned "Theft or bribery concerning programs receiving Federal funds", and the Supreme Court refers to it as an anti-bribery rule. *See Sabri v. United States*, 541 U.S. 600, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004); *Fischer v. United States*, 529 U.S. 667, 120 S.Ct. 1780, 146 L.Ed.2d 707 (2000); *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). Neither Thompson nor anyone else in state government was accused of taking a bribe or receiving a kickback. A statute's caption does not override its text, but the word "misapplies" is not a defined term. We could read that word broadly, so that it means any disbursement that would not have occurred had all state laws been enforced without any political considerations. Or we could read it narrowly, so that it means a disbursement in exchange for services not rendered (as with ghost workers), or to suppliers that would not have received any contract but for bribes, or for services that were overpriced (to cover the cost of baksheesh), or for shoddy goods at the price prevailing for high-quality goods. All of these conditions were satisfied in cases such as *United States v. Spano*, 421 F.3d 599 (7th Cir.2005), and *United States v. Martin*, 195 F.3d 961 (7th Cir.1999). None is satisfied here.

484 F.3d at 881.

    In short, Thompson was not prosecuted for taking a bribe and certainly was not convicted of bribery. Thompson's case is not that of a similarly situated comparator. Moreover, Thompson was prosecuted; consequently Siegelman does not show by reference to this case that others who committed similar crimes were not prosecuted. Thus, even though Siegelman rails about a "pattern of politicized prosecutions," a contention which *arguably* might show the existence of the motivation prong of a selective prosecution claim, the lack of similarity in the nature of Thompson's prosecution undercuts his claim.

    And the other asserted comparators have the same defect. All were prosecuted.

Siegelman's claim for discovery on his selective prosecution claim fails for another reason. In order to be entitled to discovery, Siegelman must demonstrate that the evidence he seeks is "newly discovered." Siegelman relies heavily on the April 17, 2008 report prepared for John Conyers, Jr., Chairman of the United States House of Representatives Committee on the Judiciary ("the Conyers Report").[28] In this report, the Committee on the Judiciary investigated allegations that "political considerations may have improperly influenced federal criminal prosecutions in a number of cases around the country." (Doc. # 953, Ex. I-A, at i). The Conyers report relied on allegations by Attorney Dana Jill Simpson ("Simpson") to substantiate its contention that the prosecution of former Democrat Governor Don Siegelman was motivated by politics. (Doc. # 953, Ex. I-A, at 7-19). Simpson relayed conversations she allegedly had with Rob Riley, the son of Republican Governor Bob Riley, that implicated Karl Rove, the Department of Justice and United States Attorney Leura Canary's husband in efforts to prosecute Siegelman. (Doc. # 953, Ex. I-A, at 9-10). The report concludes with the recommendation that "a thorough and fair review by the Executive Branch [of the Department of Justice]" be undertaken. (*Id*. at 34).

Thereafter, in 2009, paralegal Tamarah Grimes made numerous accusations against the United States Attorney, and others regarding the prosecution of defendants Siegelman and Scrushy. As a result of these allegations, the Attorney General of the United States and

---

[28] Siegelman quotes extensively from this report in his "summary of the evidence," but makes only vague and conclusory references to the report in his argument. Out of an abundance of caution, the court will address Siegelman's claim assuming greater reliance on this report than indicated in his brief.

the Office of Special Counsel investigated the allegations and concluded that they were unfounded.

However, Siegelman's motions for a new trial and for discovery were filed before the investigations were complete. Consequently, when the motions were filed, Siegelman contended that he was selectively prosecuted "to eliminate [him] as a viable candidate in the 2006 Alabama Governor's race." (Doc. # 960 at 70). Because the allegations contained in the Conyers Report, and from Simpson and Grimes were released after his trial, Siegelman argues that the evidence he now seeks related to these allegations is newly discovered. While these specific allegations were not made until after his trial, Siegelman's selective prosecution claim fails as a matter of law because it is clear that the defendants in this case had knowledge of and were claiming selective prosecution as early as three years prior to the commencement of trial. Defense counsel for Scrushy, Arthur Leach, submitted a letter to the Conyers Committee as well as an affidavit in this case in which he stated that, on April 6, 2006, he met with then-acting head of the Department of Justice's Public Integrity Section, Andrew Lourie. According to Leach, at the conclusion of this meeting, "it appeared . . . that some arrangement" for Scrushy to enter a plea would be approved." (Doc. # 953-8, Ex. I-G, at 6, ¶ 18.) After the plea agreement was rejected by the United States, Leach was told by Lourie that the "'decision was made over [his] head.'" (*Id*. at 7, ¶ 20). Lourie also informed Leach that the decision to reject the deal was made higher that the Assistant Attorney General for the Criminal Division, which meant it came from the Attorney General, the Deputy

Attorney General, or the White House.  (*Id.*)

Furthermore, Doug Jones, who represented Siegelman from 2003 until early 2006, testified before the House of Representatives Committee that the Department of Justice's alleged switch in its position on this case occurred in mid-2004.  (Doc. # 953, Ex. I-A, at 12). Jones further testified that the Department of Justice had "written off" any investigation of Siegelman, but then he was informed that "'there had been a meeting in Washington'" that led to a "'review of the case top to bottom.'"  (Conyers Rep. (quoting Jones's Testimony before the Committee)).  As early as 2005, Siegelman was aware of the potential for a selective prosecution claim and the involvement of officials in Washington D.C. in the decision to prosecute.

To be successful on his motion for new trial, Siegelman must demonstrate that the evidence he now seeks was discovered *after* trial, and that he exercised due diligence to discover the evidence.  *See United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003); *United States v. Schlei*, 122 F.3d 944, 991 (11th Cir. 1997).  Because Siegelman cannot meet these two prongs of the new trial test, he is not entitled to discovery on this issue.  First, while Siegelman requests voluminous email and other correspondence, he does not detail the "evidence" contained therein that he contends constitutes newly discovered evidence. Presumably, he seeks discovery to find out whatever additional information may be gleaned from the Conyers Report investigation or the Office of Special Counsel or Office of Professional Responsibility investigations which would then be 'newly discovered.'  The

court has thoroughly reviewed *in camera* the documents that Siegelman seeks.[29]  They do not support his hypothesis that other evidence exists to support his claim, nor is there anything in the material provided by the United States that is contrary to the evidence already in the hands of the defense.

Moreover, Siegelman has failed to come forward with any evidence to suggest that he exercised due diligence to discover whatever evidence he contends is out there waiting to be discovered.  It is clear that the defendant knew about the possibility of a selective prosecution claim well before trial.  However, Siegelman argues that there exists evidence that was not available until after trial.  "Newly discovered evidence is evidence that could not have been discovered with due diligence at the time of trial."  *United States v. Beasley*, 582 F.2d 337, 339 (5th Cir. 1978).  The defendant has made no showing that he exercised any diligence in attempting to discover any additional evidence of selective prosecution prior to trial.  *See United States v. Mesa*, 660 F.2d 1070, 1077 (11th Cir. 1981).

Because Siegelman cannot demonstrate that he exercised due diligence to discover the evidence he now seeks, the evidence is not considered newly discovered for purposes of a motion for new trial.  *See United States v. Lee*, 68 F.3d 1267, 1273-74 (11th Cir. 1995); *Campa*, 459 F.3d at 1151; *Jernigan*, 341 F.3d at 1287; *Schlei*, 122 F.3d at 991; *United States v. Starrett*, 55 F.3d 1525, 1554 (11th Cir. 1995).  Consequently, he is not entitled to discovery on this claim.

---

[29]  The Office of Special Counsel report and the Conyers Report are now both publicly available to the defense.

One final note. The court is cognizant that this memorandum opinion and order is substantially similar to the court's January 18, 2012, memorandum opinion and order that denied Scrushy's motion for discovery. *See* Doc. # 1070. It is so because Siegelman copied, almost verbatim, Scrushy's motion for new trial and his motion for discovery. Siegelman also relied on the evidentiary material that Scrushy filed in support of his motions. *See* Doc. # 960 at 1, fn. 1 ("Defendant Siegelman's motion for discovery is copied (with permission from co-defendant Scrushy's defense team) from the Richard Scrushy Motion for Discovery. (Doc. 955) A few modifications have been made.") Siegelman's modifications included conclusory allegations, speculations, hyperbole and perjoratives to bolster his unsupported arguments. The court has parsed Siegelman's motion for new trial and motion for discovery to glean and address any cogent arguments - many of which were raised by Scrushy. Consequently, this opinion reflects Siegelman's wholesale adoption of Scrushy's motions.

## CONCLUSION

Siegelman's motions for a new trial and his concomitant motions for discovery contain a bevy of allegations that rest on speculation, inneudo and inference. Unfortunately, the allegations are not supported by the facts. After a careful and thorough *in camera* review of all of the documents at issue, the court concludes that an evidentiary hearing is not required[30] and that Siegelman has failed to meet the exacting standards necessary to support

---

[30] Although the defendant asserts that an evidentiary hearing is necessary "for him to have a fair opportunity to prove the claims" in his motion for new trial, the court disagrees. *See United States v. Hamilton*, 559 F.2d 1370, 1373-74 (5th Cir. 1977) ("Where evidentiary hearings are ordered, it is because of certain unique situations typically involving allegations of jury tampering, prosecutorial misconduct, or third

his motion for discovery.

Accordingly, for the reasons as stated, it is

ORDERED that defendant Siegelman's motion for discovery (doc. # 961) be and is

hereby DENIED.

Done this 27th day of June, 2012.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

party confession.")  For the reasons stated herein, this case does not rise to the level of requiring an evidentiary hearing.